ORAL ARGUMENT NOT SCHEDULED YET

**10-7024**

IN THE

United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

▶▶◀◀

ALI MAHMUD ALI SHAFI, Individually and
as the natural guardian of plaintiff LAMIA ALI SHAFI;
LAMIA ALI SHAFI, Minor, by her natural guardian,
ALI MAHMUD ALI SHAFI; SHIRIN ALI SHAFI,

*Plaintiffs-Appellants,*

*against*

PALESTINIAN AUTHORITY, also known as PALESTINIAN
NATIONAL AUTHORITY, also known as PALESTINIAN INTERIM
SELF-GOVERNMENT AUTHORITY;
PALESTINIAN LIBERATION ORGANIZATION,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court
for the District of Columbia*

**BRIEF FOR PLAINTIFFS-APPELLANTS**

JAROSLAWICZ & JAROS
*Attorneys for Plaintiffs-Appellants*
225 Broadway, 24th Floor
New York, New York 10007
212-227-2780

*Of Counsel:*
  Robert J. Tolchin

## Certificate as to Parties, Rulings and Related Cases

**A.    Parties and Amici**

Plaintiffs: ALI MAHMUD ALI SHAFI, individually and as natural guardian of plaintiff L.A.S.; SHIRIN ALI SHAFI; and L.A.S., minor, by her natural guardian, Ali Mahmud Ali Shafi.

Defendants: THE PALESTINIAN AUTHORITY (a/k/a/ "The Palestinian Interim Self-Government Authority" and/or "The Palestinian National Authority"); and THE PALESTINE LIBERATION ORGANIZATION.

Amici: none

**B.    Rulings Under Review**

The Order entered by District Judge Richard W. Roberts on February 23, 2010, which granted defendants' motion to dismiss the action and denied plaintiffs' motion in the alternative for jurisdictional discovery as moot. The Memorandum Opinion directing entry of this Order is reported at *Shafi v. Palestinian Authority*, 686 F. Supp. 2d 23, (D.D.C. 2010).

**C.    Related Cases**

This case is related to the appeal pending in this Court in *Mohamad, et al. v. Rajoub, et al*, Nos. 09-7109 and 09-7158, in that both this appeal and

*Mohamad* involve the question of whether the Torture Victim Protection Act, 28

U.S.C. § 1350, permits actions against organizational defendants.

## **Table of Contents**

TABLE OF AUTHORITIES ...........................................................*iv*

JURISDICTIONAL STATEMENT ...............................................1

STATEMENT OF THE ISSUES ..................................................1

PERTINENT STATUTES ...........................................................1

STATEMENT OF FACTS ...........................................................2

SUMMARY OF THE ARGUMENT ............................................11

ARGUMENT ..............................................................................12

POINT I

THE COURT BELOW ERRONEOUSLY DISMISSED THE SHAFIS'
FIRST CLAIM FOR RELIEF .......................................................12

POINT II

THE COURT BELOW ERRONEOUSLY DISMISSED THE SHAFIS'
SECOND CLAIM FOR RELIEF ...................................................21

POINT III

THE COURT BELOW ERRED TO THE EXTENT THAT IT HELD
THAT THE TVPA PREEMPTS THE ATS UNLESS THE PLAINTIFF
LACKS A CLAIM UNDER THE TVPA.........................................26

POINT IV

IF THE SHAFIS' ATS CLAIMS ARE REINSTATED BY THIS
COURT THEIR PENDANT NON-FEDERAL CLAIMS SHOULD
ALSO BE REINSTATED ..............................................................28

CONCLUSION ............................................................................31

## Table of Authorities

### Cases

*Biton v. PA*, 510 F. Supp. 2d 144 (D.D.C. 2007) ................................................. 21

*Biton v. Palestinian Interim Self-Government Authority*, Civ. No. 01-0382 (D.D.C.) ..................................................................................... 5, 10

\*[\*] *Doe v. Islamic Salvation Front*, 993 F. Supp. 3 (D.D.C. 1998) ...................... 14

*Gilmore v. Palestinian Interim Self-Government Authority*, Civ. No. 01-853 (D.D.C.) ............................................................................................. 5

*Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56 (D.D.C. 2006) ................ 29

*Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152 (D.D.C. 2004) ................................. 15

\* *In re XE Services Alien Tort Litigation*, 665 F. Supp. 2d 569 (E.D.Va. 2009) ............................................................................................. 19

\* *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) ................................................ 17

*Klieman v. Palestinian Authority*, Civ. No. 04-1173 (D.D.C.) ....................... 5, 10

*Knox v. Palestine Liberation Organization*, Civ. No. 03-4466 (S.D.N.Y.) ................................................................................................... 5

\* *Saleh v. Titan Corp.* 580 F.3d 1 (D.C. Cir. 2009) ............................................ 13

_____

[\*] Authorities upon which we chiefly rely are marked with asterisks.

*Sanchez-Espinoza v. Reagan*, 770 F. 2d 202 (D.C. Cir. 1985) .......... 13, 14, 15, 23

*Saperstein v. Palestinian Authority*, Civ. No. 04-20225 (S.D.Fla.) ...................... 5

*Shafi v. Palestinian Authority*, 686 F. Supp. 2d 23 (D.D.C. 2010).... 11, 15, 26, 27

*Shatsky v. Syrian Arab Republic et al.*, Civ. No. 02-2280 (D.D.C.) ...................... 5

*\*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009)................. 18, 21

*Sokolow v. Palestine Liberation Organization*, Civ. No. 04-00397-
    GBD (S.D.N.Y.) ............................................................................. 5, 10, 22

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ....................................... 14, 15, 20

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir. 1984) ......... 13, 14, 23

*Ungar v. PLO*, 402 F.3d 274 (1st Cir. 2005) ....................................................... 21

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D.Mass. 1995) ...................................... 29

## Treaties, Statutes and Rules

18 U.S.C. § 2333 .................................................................................................. 9

18 U.S.C. § 2336 .................................................................................................. 9

18 U.S.C. § 2441 ................................................................................................ 19

28 U.S.C. § 1291 .................................................................................................. 1

28 U.S.C. § 1331 .................................................................................................. 1

28 U.S.C. § 1350 ................................................................... 1, 2, 15, 24

28 U.S.C. § 1367 ............................................................................ 1, 30

United Nations' Declaration on the Protection of All Persons from
    Being Subjected to Torture, G.A.Res. 3452, U.N. GAOR,
    U.N. Doc. A/1034 (1975) at § 1 ................................................ 24

Convention Against Torture and Other Cruel, Inhuman, or
    Degrading Treatment or Punishment pt. I, art. 1, 23 I.L.M.
    1027 (1984), *as modified,* 24 I.L.M. 535 (1985), *entered into
    force* June 26, 1987, *ratified by the United States* Oct. 21,
    1994, 34 I.L.M. 590, 591 (1995) ................................................ 23

**Other Authority**

Jan E. Aldykiewicz, Geoffrey S. Corn, Authority to Court-Martial
    Non-U.S. Military Personnel for Serious Violations of
    International Humanitarian Law Committed During Internal
    Armed Conflicts, 167 Mil. L. Rev. 74 (2001) at 142 ................................. 18

Omar M. Dajani, *Stalled Between Seasons: The International Legal
    Status of Palestine During the Interim Period*, 26 Denv. J.
    Int'l L. & Pol'y 27 (1997) ........................................................ 22

Jordan J. Paust, *Responding Lawfully to al Qaeda*, 56 Cath. U. L.
    Rev. 759 (2007) ........................................................................ 17

Geoffrey R. Watson, The Oslo Accords (2000) .................................. 22

## BRIEF FOR APPELLANTS

## JURISDICTIONAL STATEMENT

The court below had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1350 and 1367. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, because this is an appeal from a final judgment of the court below dismissing plaintiffs-appellants' action.

## STATEMENT OF THE ISSUES

1)      Whether torture committed by a private (i.e. non-state) actor in the course of an "armed conflict" is actionable under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.

2)      Whether torture committed by an official of a non-sovereign government is actionable under the ATS.

3)      Whether the enactment of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, precluded actions for torture under the ATS.

4)      Whether, if the dismissal of Plaintiffs-Appellants' federal claims is reversed by this Court, the dismissal of their pendant, non-federal claims should be reversed as well.

## PERTINENT STATUTES

28 U.S.C. §§ 1350, 1350 note.

## <u>STATEMENT OF FACTS</u>

Though the decision appealed from recites *some* of the relevant background facts its account is not complete and, in certain respects, imprecise.

Accordingly, the Plaintiffs-Appellants set forth all relevant facts below.

## I.     **Nature of This Action**

This is a civil action for damages brought by Plaintiffs-Appellants Ali Mahmud Ali Shafi ("Ali"), his wife Shirin Ali Shafi ("Shirin") and Ali's minor daughter L.A.S. (collectively: the "Shafis").

Ali is a Palestinian who was abducted in the West Bank on or about September 21, 2001, by Defendants-Appellees the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively the "Defendants"), and brutally tortured by the Defendants for approximately six months "in violation of the law of nations" within the meaning of the Alien Tort Statute ("ATS") 28 U.S.C. § 1350.

## II.     **Ali Was Tortured As Part of an Armed Conflict and by Public Officials**

In the fall of 2000 widespread, extensive armed violence between Palestinians and Israelis erupted in Israel, the West Bank and the Gaza Strip. This

campaign of violence, which is commonly known as the "Intifada" (or the "Second Intifada"[1]) continued until 2005.

Defendants PA and PLO supported the Intifada both politically and materially as a matter of official policy. Defendants' official policy of support for Intifada violence was publicly acknowledged by PA and PLO officials and spokespersons on many occasions. Recently, for example, the PA's official television station aired an interview with Ashraf Al-Ajrami, the just-retired PA Minister of Prisoner Affairs, in which Al-Ajrami boasted as follows:

> Hamas tried – unjustly and deceitfully – to take credit for the Intifada, while the only one deserving credit for it was Yasser Arafat… [the PA security] forces paid a heavy price in the second Intifada, in terms of martyrs and prisoners…. Moreover, they were among those who bore arms, and carried out the largest and most important operations against the Israeli–and especially against soldiers—including the well-known operations in the West Bank…. These operations were carried out by the heroes of the Palestinian security forces, who were defending the homeland and the national interests, while Hamas stood on the sidelines for many months....

(Dkt. # 25[2], Exhibit A.[3])

---

[1] The first Intifada took place between 1987 and 1993.

[2] "Dkt." refers to docket entries in the underlying case.

[3] Exhibit A was a DVD copy of the interview with former PA Minister Al-Ajrami, which the Shafis hand-filed with the district court. That

*(continued next page)*

Moreover, our own Executive Branch has explicitly confirmed that the defendants were involved in Intifada violence. For example, in June 2002 Secretary of State Powell stated:

> [A]fter the Israelis pulled back from the latest occupation, then we thought maybe we'd have some movement [to halt terrorism].What we saw instead were more bombings, bombing after bombing after bombing, day after day.
>
> And frankly, ***we also saw a continuing indication that there was complicity with the senior levels of the Palestinian Authority***.

(Dkt. # 25, Exhibit B at p. 2). (Emphasis added).

Likewise, Secretary of State Rice confirmed that during the Intifada "Arafat...had one foot in terror and one foot in politics" and the "Palestinian Authority…was…overrun by its ties with terrorism." (Dkt. # 25, Exhibit C at p. 3.)

Similarly, the White House spokesman officially verified in April 2003 that:

> Yasser Arafat was not a party to peace. Yasser Arafat was a part of the problem…***Yasser Arafat lied to President Bush…and actively worked on behalf of the terrorists***, lying to the President of the United States about Palestinian support, ***led by Yasser Arafat, for terrorism***.

(Dkt. # 25, Exhibit D at p. 6). (Emphasis added).

---

interview was downloaded from and may be viewed at www.memritv.org:80/clip/en/2180.htm.

Numerous civil damages actions have been brought against the instant Defendants in the federal courts under the civil provisions of the Antiterrorism Act, 18 U.S.C. § 2333(a), arising from Defendants' involvement in Intifada violence. *See, e.g., Knox v. Palestine Liberation Organization*, Civ. No. 03-4466 (S.D.N.Y.); *Biton v. Palestinian Interim Self-Government Authority*, Civ. No. 01-0382 (D.D.C.); *Gilmore v. Palestinian Interim Self-Government Authority*, Civ. No. 01-853 (D.D.C.); *Klieman v. Palestinian Authority*, Civ. No. 04-1173 (D.D.C.); *Shatsky v. Syrian Arab Republic et al.*, Civ. No. 02-2280 (D.D.C.); *Saperstein v. Palestinian Authority*, Civ. No. 04-20225 (S.D.Fla.); and *Sokolow v. Palestine Liberation Organization*, Civ. No. 04-00397-GBD (S.D.N.Y.).

One of the many ways in which the Defendants participated in and supported the Intifada (aside from carrying out actual acts of violence) was to hunt down, imprison, torture, and murder Palestinian informants who assisted Israeli law-enforcement agencies in preventing Intifada violence. The Defendants arrested, tortured and murdered these informants in order to disrupt Israeli efforts to thwart Intifada violence (both by eliminating existing informants and deterring other Palestinians from becoming informants) and to thereby facilitate further Intifada violence.

Defendants' policy and actions toward these confidential informants (whom the Defendants term "collaborators") was publicly acknowledged, notorious and well documented. For example, a report issued by the independent

international human rights organization Human Rights Watch ("HRW") in

November 2001 (at the very time that Ali was being tortured by the defendants)

found that:

> During this Intifada, the PA has arrested hundreds of
> suspected collaborators, ***tortured many*** to extract
> confessions, put some on trial, and televised confessions.
> State security and military courts have convicted a
> handful—imposing the death penalty on most, two of
> whom have been executed. ***The aim is to punish suspected***
> ***collaborators and deter others from assisting Israel***.

(Dkt. # 25, Exhibit E at 22-23). (Emphasis added).

And a report issued by Amnesty International in October 2001 found

that:

> Palestinians suspected of "collaboration" with Israel have
> frequently been arrested, held incommunicado ***and***
> ***tortured by the Palestinian Authority security services***.
> More than 300 suspected "collaborators" are now believed
> to be detained, without charge or trial, in the areas under
> the Palestinian Authority in Gaza and the West Bank.
> Some have been held without charge or trial for more than
> five years. A number of those accused of "collaboration"
> are said to have died in circumstances which suggest they
> were extrajudicially executed by members of the PA
> security forces or killed by armed Palestinian groups.

(Dkt. # 25, Exhibit F at 1). (Emphasis added).

As Amnesty International also found, Palestinians accused of collaboration with Israel were summarily executed by the Palestinian Authority after a kangaroo trial before the PA's "State Security Court":

> After a one-day trial, Walid Hamdiya was sentenced to death by firing squad by the State Security Court in Gaza…. Palestinian security officials have described Walid Hamdiya as the most senior Palestinian "collaborator" ever uncovered….

> Amnesty International has previously condemned trials by the State Security Court as being grossly unfair. Trials are often summary, take place before military judges, and have no right of appeal. Sentences are subject only to ratification by President Arafat and may be carried out within hours or days of the trial.

> People convicted of "collaboration" with Israel face extremely harsh treatment. Since the beginning of the current intifada in September 2000, three alleged "collaborators" have been executed after summary unfair trials.

(Dkt. # 25, Exhibit G).

Defendants' official policy toward accused "collaborators" during the Intifada is thus indisputable; aside from the extensive evidence gathered by objective human rights organizations,[4] this policy was publicly confirmed by the

---

[4] Both HRW and Amnesty issued other reports documenting the Defendants' torture and murder of alleged collaborators during this period. *See e.g.* http://www.hrw.org/en/publications and http://www.amnesty.org/en/library.

*(continued next page)*

PA's own widely publicized official "trials" and executions of Palestinians suspected of collaboration.

Moreover, Defendants' policy of torture has been expressly confirmed by the United States Department of State. For example, the State Department's Report on Human Rights Practices for 2001 found that:

> The PA does not prohibit by law the use of torture or force against detainees, and PA security forces reportedly regularly employ torture and abuse against Palestinian detainees. Such abuse generally takes place after arrest and during interrogation, and reportedly is widespread…

> PA security officials torture and abuse prisoners by threatening, hooding, beating, and tying detainees in painful positions, forcing them to stand for long periods of time, depriving them of sleep and food, and burning detainees with cigarettes and hot instruments.

(Dkt. # 25, Exhibit H at 33).

The State Department reports for 2000 and 2002 made substantively identical findings. (Dkt. # 25, Exhibit I at 23 and Exhibit J at 24).

The facts described above are set forth in ¶¶ 11-22 of the Shafis' First Amended Complaint ("FAC") in this matter. (Dkt. # 19).

---

Likewise, even Palestinian human rights groups which **support** the arrest and trial of "collaborators," such as the Palestinian Centre for Human Rights and the Palestinian Human Rights Monitoring Group, have confirmed Defendants' torture of "collaborators" during the Intifada. *See* www.pchrgaza.org/files/PressR/English/2002/104-2002.htm; www.phrmg.org/monitor2001/jul2001.htm.

Plaintiff Ali Mahmud Ali Shafi is one of the victims of the Defendants' policy toward suspected "collaborators" during the Intifada. As detailed in the FAC, Ali was arrested and detained by PA security forces for some six months on suspicion of assisting Israel to prevent Intifada violence, during which time Ali was severely and systematically tortured by the Defendants. Ali was eventually convicted and sentenced to death in a 30 minute "trial" by one of the PA's kangaroo security courts, and escaped his captors and his fate only by a series of extremely fortuitous events. (Dkt. # 19 at ¶¶ 23-62).

Accordingly, Ali, Shirin and L.A.S. brought the instant action.

In their First Claim for Relief, the Shafis assert that Defendants' conduct took place as part of an "armed conflict" within the meaning of international law, and that that conduct – *i.e.,* use of torture – breached peremptory rules of armed conflict recognized by international customary law and reflected in Common Article 3 of the Geneva Conventions. (Dkt. # 19 at ¶¶ 65-81).

Importantly, the instant Defendants themselves have repeatedly asserted in our federal courts that the Intifada was indeed an "armed conflict." Defendants have made this assertion in support of motions to dismiss the civil actions brought against them under § 2333 of the Antiterrorism Act ("ATA") on the ground that the terrorist attacks complained of in those suits were "acts of war" and therefore not actionable pursuant to § 2336 of the ATA (which bars actions under § 2333 that arise from an "act of war.").

-9-

Thus, in *Klieman v. Palestinian Authority*, Civ. No. 04-1173 (D.D.C.), the instant Defendants filed papers in the district court expressly asserting that the Intifada "***constitutes 'armed conflict' under international law***." (Dkt. # 25, Exhibit K at 39; *see also id.* at 33-44).

Defendants made the identical assertion in memoranda submitted by them in *Biton v. Palestinian Authority*, Civ. No. 01-0382 (D.D.C.), and in *Sokolow v. Palestine Liberation Organization*, Civ. No. 04-00397-GBD (S.D.N.Y.). (*See* Dkt. # 25, Exhibit L at 19-24 and Exhibit M at 39-42).

In light of the above, it is unsurprising that Defendants' motion to dismiss the Shafis' FAC did not dispute that the Intifada was indeed an "armed conflict" under international law.

In their Second Claim for Relief, the Shafis allege that the PA's conduct violated universally recognized and applicable norms of international customary law prohibiting torture by a public official. (Dkt. # 19 at ¶¶ 82-92).

In their Third Claim for Relief, which is brought on behalf of Ali's minor daughter, L.A.S., the Shafis allege that the Defendants' conduct constituted the tort of Negligence under Israeli law. (Dkt. # 19 at ¶¶ 93-105).

The Defendants filed a motion to dismiss the FAC for failure to state a claim, lack of subject-matter jurisdiction (nonjusticiability) and lack of personal jurisdiction. Dkt. # 21. The Shafis opposed Defendants' motion (Dkt. # 25), and filed a motion in the alternative for personal jurisdictional discovery (Dkt. # 26).

The court below granted Defendants' motion to dismiss, and denied the Shafis' motion in the alternative for jurisdictional discovery as moot. Dkt. # 40-41. *Shafi v. Palestinian Authority*, 686 F. Supp. 2d 23 (D.D.C. 2010).

As shown below, the decision of the court below was erroneous and should be reversed, and this case should be remanded for discovery and trial.

## SUMMARY OF THE ARGUMENT

1) The court below erred when it dismissed the Shafis' First Claim for Relief. Under the current state of customary international law acts of torture carried out as part of an armed conflict constitute war crimes and are therefore actionable under the ATS.

2) The court below erred when it dismissed the Shafis' Second Claim for Relief. Under the current state of customary international law acts of torture carried out by an official of a non-sovereign government violate peremptory norms of customary international law and are therefore actionable under the ATS.

3) The court below erred to the extent, if any, that it based its holding that the TVPA does not bar claims for torture under ATS on the fact that the Shafis cannot bring a claim under the TVPA because the instant Defendants are organizations and not natural persons. The TVPA never preempts torture claims under the ATS, regardless of whether the plaintiff has a claim under the TVPA.

-11-

4)    The court below dismissed the Shafis' pendant, non-federal claims on the sole ground that absent federal-question jurisdiction it would not exercise supplemental jurisdiction. Accordingly, if this Court reinstates the Shafis' federal claims, it should also reinstate their supplemental claims.

## ARGUMENT

**POINT I**

**THE COURT BELOW ERRONEOUSLY DISMISSED THE SHAFIS' FIRST CLAIM FOR RELIEF**[5]

In the First Claim for Relief, the FAC asserts that Defendants' conduct took place as part of an "armed conflict" within the meaning of international law (a fact that Defendants do not dispute), and that such conduct—the use of torture as part of an armed conflict—violates the peremptory rules of armed conflict recognized by international customary law and reflected in Common Article 3 of the Geneva Conventions and is therefore actionable under the ATS. (Dkt. # 19 at ¶¶ 65-81).

Significantly, the court below did **not** find that the Shafis' First Claim for Relief is invalid on the **merits**; rather, it held that it was **constrained** to dismiss

---

[5] Because this prong of the district court's decision rests purely on interpretation of earlier decisions of this Court and of customary international law, the standard of review is *de novo*.

the Shafis' claim in light of the decisions of this Court in *Sanchez-Espinoza v. Reagan*, 770 F. 2d 202 (D.C. Cir. 1985) and *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir. 1984). *See Shafi* 686 F. Supp. 2d at 29-31.

The court below believed it was bound by *Sanchez-Espinoza* and *Tel-Oren*, even though those decisions may "reflect an antiquated construction of international norms" and "may be ripe for reconsideration by the circuit, especially in light of the well-reasoned and more recent opinion" in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995). *See Shafi*, 686 F. Supp. 2d at 30.

In so deciding, the court below erred in two respects:

***First***, neither *Sanchez-Espinoza* nor *Tel-Oren* addressed, much less decided, the question of whether war crimes committed by a private (*i.e.,* non-state) defendant are actionable under the ATS. While it is true that the factual background of *Sanchez-Espinoza* involved an armed conflict, plaintiffs' claims in that case were framed as "torture" and not as "war crimes."

Thus, neither *Sanchez-Espinoza* nor *Tel-Oren* precluded the district court from addressing the merits of the Shafis' First Claim for Relief.

Indeed, in *Saleh v. Titan Corp.* 580 F.3d 1, (D.C. Cir. 2009) this Court held that "[e]ven if torture suits cannot be brought [under the ATS] against private parties—at least not yet—it may be that 'war crimes' have a broader reach." *Id.* 580 F.3d at 15 n. 13. This statement makes clear that whether an ATS action for

-13-

war crimes can be brought against private parties is an **open question** in this Circuit, and that *Sanchez-Espinoza* did not settle (or even address) this issue.[6]

The fact is that the **sole** on-point case from this federal district is *Doe v. Islamic Salvation Front*, 993 F. Supp. 3 (D.D.C. 1998), which explicitly found— just as the Shafis assert here—that violations of the peremptory rules of armed conflict (as reflected in Common Article 3 of the Geneva Conventions) by a non-state defendant are indeed actionable under § 1350. *Doe* at 7-9.

**Second**, in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court directed that the existence of a viable claim under § 1350 be determined in light of "***the present-day law of nations***," *i.e.,* that the plaintiff's "claim must be gauged against ***the current state of international law***." *Id.* at 725, 733. (Emphasis added).

Thus, even assuming that *Sanchez-Espinoza* or *Tel-Oren* were factually and legally apposite to Shafis' First Claim for Relief (and, as noted *supra*, they are not), those cases would not be controlling because they do not reflect "the present-day law of nations." *Sosa*, 542 U.S. at 725. *Cf. Doe*, 993 F. Supp. at 8

---

[6] Clearly, there is a difference between a war crime that happens to also be an act of torture, and torture *simpliciter* (i.e. torture which is not a war crime). If, as the Shafis assert, war crimes committed by private actors are actionable under the ATS, there is no legal or logical basis to immunize from ATS liability war crimes that also constitute "torture."

("The interpretation of international law in *Karadzic* in 1995 is far more timely than the interpretations set forth in *Tel-Oren,* which examined international law as it stood almost fifteen years ago.")

In any event, even assuming *arguendo* that *Sanchez-Espinoza* or *Tel-Oren* held that war crimes committed by non-state defendants are not actionable under the ATS, such a holding conflicts with the "current state of international law" (*Sosa*, 542 U.S. at 733) and should now be revisited and abrogated by this Court. *Cf. Saleh*, 580 F.3d at 15 n. 3 (Noting that "it may be that 'war crimes'" by non-state actors are actionable under the ATS); *Shafi*, 686 F. Supp. 2d at 30 (*Sanchez-Espinoza* and *Tel-Oren* may "reflect an antiquated construction of international norms" and "may be ripe for reconsideration by the circuit, especially in light of the well-reasoned and more recent opinion in *Karadzic*").

In their First Claim for Relief, the Shafis assert that because the torture of Ali was carried out by Defendants as part and parcel of the Intifada, which was an "armed conflict" under international law, Defendants' conduct violated the provisions of customary international law reflected in Common Article 3 of the Geneva Conventions. (Dkt. # 19 at ¶¶ 65-81).

*Sosa* held that an action may be brought under § 1350 for violation of a norm "of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Sosa*, 542 U.S. at 728.

-15-

There is no question whatsoever that Shafis' First Claim for Relief meets this standard, because the laws of war and armed conflict set out in the Geneva Conventions—and especially the rules set out in Common Article 3 of the Geneva Conventions—are doubtless **the most clearly defined and universally accepted of all international legal norms**:

> It is universally agreed, and is demonstrable in the Convention language itself, in the context in which it was adopted, and by the generally accepted law of nations, that Common Article 3 embodies "international human norms," *Mehinovic v. Vuckovic,* 198 F. Supp. 2d 1322, 1351 (N.D.Ga. 2002), and that it sets forth the "most fundamental requirements of the law of war." *Kadic v. Karadzic,* 70 F.3d at 232, 243 (2d Cir. 1995). The International Court of Justice has stated it plainly: "There is no doubt that, in the event of international armed conflicts... [the rules articulated in Common Article 3]... constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the court in 1949 called 'elementary considerations of humanity.'" *Nicaragua v. United States,* 1986 I.C.J. 14, 114 (Judgment of June 27).

*Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152, 163 (D.D.C. 2004).

In other words, the provisions of Common Article 3 are not merely *treaty* provisions binding only on the signatories to the Conventions. Rather, it is unanimously recognized by all authorities that the norms set out in Common Article 3 *reflect peremptory customary norms* of international law which are

***universally binding*** on all participants in both international and non-international armed conflicts, irrespective of whether they are parties to the Conventions.

An exhaustive and up-to-date list of authorities supporting and confirming this consensus is provided in Jordan J. Paust, *Responding Lawfully to al Qaeda*, 56 Cath. U. L. Rev. 759 (2007), at footnote 124. (Dkt. # 25, Exhibit N).

Accordingly, even private persons and other non-state actors – such as the instant Defendants – are bound by the norms reflected in Common Article 3:

> [T]he most fundamental norms of the law of war [are] embodied in common article 3, which binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents. The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II, and remains today an important aspect of international law, see Jordan Paust, After My Lai: The Case for War Crimes Jurisdiction Over Civilians in Federal District Courts, in 4 The Vietnam War and International Law 447 (R.Falk ed., 1976). The District Court has jurisdiction pursuant to the Alien Tort Act over appellants' claims of war crimes…

*Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995). (Emphasis added, citations omitted). (Also noting that by its own terms, Common Article 3 applies to "each Party to the conflict.").

Similarly:

> Common Article 3(1) of the Geneva Conventions of 1949 [is] now considered to be customary international law. As

-17-

> such, [its] provisions are binding on all nations **and parties** to a non-international—that is, internal—armed conflict, irrespective of whether the state is a signatory to the Geneva Conventions…. Likewise, the provisions are **equally binding on non-state belligerents**, regardless of whether they have agreed to be bound by the Conventions….

Jan E. Aldykiewicz, Geoffrey S. Corn, Authority to Court-Martial Non-U.S. Military Personnel for Serious Violations of International Humanitarian Law Committed During Internal Armed Conflicts, 167 Mil. L. Rev. 74, 90 (2001) at 142. *See also, id*., at 105-142 (summarizing numerous authorities).

Recent decisions of the federal courts further support the Shafis' position:

For example, the August 2009 decision of the Court of Appeals for the Eleventh Circuit in *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009) confirmed—just as asserted by the Shafis—that conduct that breaches the laws of armed conflict, such as murder and torture, is actionable under the ATS even when committed by private (i.e. non-state) actors:

> [U]nder the ATS, **the plaintiffs need not plead state action for claims of torture** and murder perpetrated in the course of war crimes. **Some acts, such as torture and murder committed in the course of war crimes**, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual. The war crimes exception dispenses with the state action requirement for claims under the ATS

*Id.* at 1266-67. (Citations and footnote omitted).[7]

Likewise, the recent decision in *In re XE Services Alien Tort Litigation*, 665 F. Supp. 2d 569 (E.D.Va. 2009), conducted an extremely thorough analysis and concluded (joining every other court to have considered the issue) that war crimes committed by non-state defendants are actionable under the ATS. *Id.* at 582-88.

The Shafis' position is further buttressed by the language of 18 U.S.C. § 2441, which is the federal provision criminalizing breaches of Common Article 3. By its plain terms, § 2441 does not apply only to state actors, but rather to ***any*** person. *See* § 2441(a) ("***Whoever***, whether inside or outside the United States, commits a war crime" shall be fined or imprisoned); § 2441(c)(3) (defining a war crime as a breach of Common Article 3) (emphasis added).

---

[7] *Sinaltrainal* held that such conduct is actionable under the ATS when it is "perpetrated because of" or "in the course of" the armed conflict, or when the armed conflict "precipitate[d] the violence that befell the plaintiffs." *Id.* at 1267. *See also In re XE Services*, 665 F.Supp.2d at 585-87 (Holding that "plaintiffs must allege that the conduct constituting war crimes occurred in the context of and in association with an ongoing armed conflict."). The allegations of the FAC easily meet these "nexus" requirements, since they assert in extensive detail that the Defendants tortured Ali for the specific purpose of facilitating and supporting the armed conflict against Israel and as part and parcel of that conflict. (*See* Dkt. # 19 at ¶¶ 11-21, 46-53, 66-76).

Finally, the Defendants themselves have expressly admitted that their violent conduct in the context of the Intifada might well constitute war crimes. (Dkt. # 25, Exhibit K at 39) ("Sec. 2336 (a) bars maintenance of this action and requires its dismissal without regard to whether the shooting attack was legal or illegal under the laws of armed conflict or war. *If illegal the attack may well be a war crime and subject to sanctions as such*.") (Emphasis added); (Dkt. #25, Exhibit M at 41) ("Sec. 2336 (a) bars maintenance of this action and requires its dismissal without regard to whether the shooting attack was legal or illegal under the laws of armed conflict or war. *If illegal the attack may well be a war crime and subject to sanctions as such*.") (Emphasis added).

In sum, under the "current state of international law" (*Sosa*, 542 U.S. at 733), war crimes committed by non-state defendants are actionable under the ATS.

Nor is there any question that torture committed as part of an armed conflict is a war crime, since such conduct violates Common Article 3, which expressly provides in relevant part that "[p]ersons taking no active part in the hostilities...shall in all circumstances be treated humanely" and:

> To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the abovementioned persons:

> (a) violence to life and person, in particular murder of all kinds, mutilation, *cruel treatment and torture*;

-20-

Geneva Convention I art. 3(1). (Emphasis added)

Thus, the use of torture as part of an armed conflict violates the fundamental, clearly defined and universally accepted rules of armed conflict and is therefore actionable under the ATS, irrespective of whether the torture is committed by a state actor or a private person. *Cf. Sinaltrainal*, 578 F.3d at 1266 ("[U]nder the ATS, the plaintiffs need not plead state action for claims of torture…perpetrated in the course of war crimes.").

Accordingly, the Shafis' First Claim for Relief is viable under the ATS and the decision of the district court dismissing that claim should be reversed.

## POINT II

## THE COURT BELOW ERRONEOUSLY DISMISSED THE SHAFIS' SECOND CLAIM FOR RELIEF[8]

The Defendants and the Shafis agree (as has every court to have ruled on the issue) that the PA is not a foreign state. (*See* Dkt. # 21 at 17); *Shafi*, 686 F.Supp.2d at 29 ("The parties agree that the PA and the PLO are non-state actors."); *Ungar v. PLO*, 402 F.3d 274, 282-92 (1st Cir. 2005) (neither PA nor PA is a foreign state); *Biton v. PA*, 510 F. Supp. 2d 144, 147 (D.D.C. 2007) (PA/PLO

---

[8] Because this prong of the district court's decision rests purely on interpretation of earlier decisions of this Court and of customary international law, the standard of review is *de novo*.

remain non-states); *Sokolow v. PLO*, 583 F. Supp. 2d 451, 457-58 (S.D.N.Y. 2008) (same).

  The FAC alleges, however, that although the PA is not a foreign state, it is "a municipal governmental entity, and it is empowered to exercise a variety of governmental powers in various parts of the West Bank and Gaza Strip, and to maintain law enforcement and security personnel, courts and prisons in various parts of the West Bank and Gaza Strip." (Dkt. # 19 at ¶ 83; *see also id.* at ¶ 7) (alleging that the PA is "a non-sovereign municipal government which provided certain governmental services in parts of the West Bank and Gaza Strip.").

  The Defendants do not dispute the fact that the PA is a non-sovereign municipal governmental entity empowered to exercise a variety of governmental powers, including police and penal powers, in parts of the West Bank and Gaza. Nor could Defendants dispute this plain fact if they wanted to. *See, e.g.,* Omar M. Dajani, *Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period*, 26 Denv. J. Int'l L. & Pol'y 27, 86 (1997) (discussing the nature of the PA as a non-sovereign municipal government and the scope of its authority); Geoffrey R. Watson, The Oslo Accords (2000) (same).

  The FAC further alleges in the Second Claim for Relief that Ali "was tortured by the PA's governmental law enforcement and security officials, acting pursuant to the official governmental policy and instructions of the PA, in a governmental prison facility owned and operated by the PA" and that this conduct

-22-

is actionable under the ATS because it violated peremptory norms of customary international law prohibiting torture by public officials. (Dkt. # 19 at ¶¶ 82-92).

The court below dismissed the Second Claim for Relief for the same reason it dismissed the Shafis' First Claim for Relief: *i.e.,* it considered itself bound by to do so by *Sanchez-Espinoza* and *Tel-Oren*. *See Shafi*, 686 F. Supp. 2d at 29-31.

The court below erred in dismissing the Second Claim for Relief because neither *Sanchez-Espinoza* nor *Tel-Oren* addressed much less decided the question of whether torture by public officials of a non-sovereign government is actionable under the ATS, because the court below had a duty, under *Sosa*, to examine this question in light of the current state of international law, and because—on the merits—there is no question that peremptory norms of customary international law prohibit torture carried out by any governmental official, irrespective of whether the government in question is merely municipal (as here) or a sovereign state.

These universal *jus cogens* norms are reflected, *inter alia*, in the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment pt. I, art. 1, 23 I.L.M. 1027 (1984), *as modified,* 24 I.L.M. 535 (1985), *entered into force* June 26, 1987, *ratified by the United States* Oct. 21, 1994, 34 I.L.M. 590, 591 (1995) (defining torture as "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an

official capacity") and in the United Nations' Declaration on the Protection of All Persons from Being Subjected to Torture, G.A.Res. 3452, U.N. GAOR, U.N. Doc. A/1034 (1975) at § 1 (defining torture as being "inflicted by or at the instigation of a public official").

Since the PA is a **government** (albeit not a state) its officials and employees are therefore "public officials" and so subject to the prohibitions set forth in the Convention Against Torture and the United Nations' Declaration.

Accordingly, the Second Claim for Relief also states a valid claim.

This conclusion is also supported by the decision in *Kadic v. Karadzic*, 70 F.3d 232. There, the Second Circuit was faced with the question of whether atrocities committed by president of the self-proclaimed Bosnian-Serb republic of "Srpska" were carried out "under actual or apparent authority, or color of law, of any foreign nation" within the meaning of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note. The Second Circuit answered this question in the affirmative, **on two completely separate grounds**:

***First***, the Second Circuit noted that though Srpska was not a recognized "foreign state," plaintiffs had alleged that in fact it satisfied the four accepted criteria of statehood. *Id.* 70 F.3d at 245.

***Second***, and critically here, the Second Circuit held that a governmental defendant will liable under the TVPA even if it is ***not*** a state:

-24-

> Moreover, it is likely that the state action concept, where applicable for some violations like "official" torture, requires ***merely the semblance of official authority***. The inquiry, after all, is whether a person purporting to wield ***official power*** has exceeded internationally recognized standards of civilized conduct, ***not whether statehood in all its formal aspects exists***.

*Id*. (Emphasis added).

Thus, under this second prong of *Kadic*, the PA's lack of statehood would be of no moment even if the plaintiffs were asserting TVPA claims (which they are not). The relevant point is that the Ali was tortured by persons acting under governmental authority—*i.e.,* under the "official authority" and "official power" of the PA government.

Since such conduct would suffice even under the TVPA, which expressly requires that the torture be committed "under actual or apparent authority, or color of law, ***of any foreign nation***" (emphasis added) it suffices *a priori* for the Second Claim for Relief, under which the Shafis need only demonstrate that the torture was "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

Accordingly, the Shafis' Second Claim for Relief is viable under the ATS and the decision of the district court dismissing that claim should be reversed.

POINT III

**THE COURT BELOW ERRED TO THE EXTENT THAT IT HELD THAT THE TVPA PREEMPTS THE ATS UNLESS THE PLAINTIFF LACKS A CLAIM UNDER THE TVPA[9]**

The Defendants moved to dismiss the Shafis' ATS claims on the grounds that (a) following the enactment of the TVPA, civil actions for torture in violation of the law of nations can no longer be brought under the general provision of the ATS but rather must be brought solely under the rubric of and pursuant to the conditions set forth in the TVPA and (b) the PA and PLO are not subject to suit under the TVPA because they are neither "individuals" nor "foreign nations" within the meaning of the TVPA. (Dkt. # 21 at 12-18).

The court below rejected this argument, correctly finding (apparently) that the TVPA does not preempt the ATS in any way. *Shafi*, 686 F. Supp. 2d at 26-28.

However, after first finding (apparently) that the TVPA does not preempt the ATS in any circumstances, the court below then went on to state (a) that because the TVPA permits actions only against an "individual" it does not allow suits against non-natural persons such as the PA and PLO; (b) that the Shafis' therefore have no remedy under the TVPA; and (c) that the TVPA does not

---

[9] This issue involves a question of pure statutory construction and the standard of review is therefore *de novo*.

preempt the ATS where the plaintiff has no remedy under the TVPA (such as when the defendant is not a natural person). *Shafi*, 686 F. Supp. 2d at 28-29.

It light of the above is unclear to the Shafis, respectfully, whether the court below held that the TVPA does not preempt the ATS in any circumstances or that there is no preemption only when the plaintiff has no remedy under the TVPA.

If the court below held that the TVPA does not preempt the ATS in any circumstances its holding should be affirmed.

However, if the court below held that the TVPA preempts the ATS unless the plaintiff has no remedy under the TVPA that holding should be reversed, and this Court should find that the TVPA does not preempt the ATS in any way.

The Shafis are constrained to appeal this holding of the lower court (if indeed there was such a holding) because the question of whether the term "individual" as used in the TVPA excludes non-natural defendants has never been resolved by this Court, and is currently before this Court in the pending appeals in *Mohamad v. Rajoub*, Nos. 09-7109 and 09-7158.

If this Court holds in *Mohamad* that the term "individual" as used in the TVPA does ***not*** exclude non-natural defendants (as argued by the appellants in *Mohamad*) it would undermine the (possible) holding of the court below here that the TVPA does not preempt the ATS in the instant case because the Shafis cannot bring an action against non-natural persons under the TVPA.

Accordingly, if this Court holds in *Mohamad* that the term "individual" as used in the TVPA does not preclude actions against non-natural defendants, it should reverse the holding of the court below (if there was such a holding) that the TVPA preempts the ATS unless the plaintiff has no remedy under the TVPA and should hold that the TVPA does not preempt the ATS in any circumstances.

In support of this prong of their appeal, the Shafis incorporate by reference all the reasons and all the authorities set forth in the **first** part of the lower court's decision (*i.e.,* at *Shafi*, 686 F. Supp. 2d at 26-28) in which the court below may have held that the TVPA does not preempt the ATS in any circumstances.

### POINT IV

### IF THE SHAFIS' ATS CLAIMS ARE REINSTATED BY THIS COURT THEIR PENDANT NON-FEDERAL CLAIMS SHOULD ALSO BE REINSTATED

In the Third Claim for Relief the FAC asserted a claim for Negligence under Israeli law on behalf of Ali's minor daughter L.A.S., on the basis of the district court's supplemental subject-matter jurisdiction. (Dkt. # 19 at ¶¶ 93-105).

In their motion to dismiss, the Defendants argued that the claims for damages asserted by Shirin and L.A.S. under the ATS, which are set forth in FAC

¶¶ 78 and 89, are not cognizable.[10] In support of this argument Defendants cited to *Xuncax v. Gramajo*, 886 F. Supp. 162 (D.Mass. 1995) where, Defendants asserted, the court rejected claims similar to those presented by Shirin and L.A.S. after finding that the closest federal statute to the ATS is the TVPA and that the TVPA does not permit claims by relatives of torture victims. (Dkt. # 21 at 25-27).

The Shafis responded to this argument by pointing out that the *Xuncax* court examined the TVPA only ***after*** determining that state (Massachusetts) law would not provide the plaintiffs with a cause of action. (Dkt. # 25 at 26-27). Therefore, the Shafis argued, even if the district court were to follow *Xuncax* as urged by the Defendants it should first look to D.C. law to determine whether Shirin and L.A.S. have a remedy—and since under D.C. law the immediate relatives of a person who suffers but survives severe physical violence have valid claims for intentional infliction of emotional distress (IIED),[11] applying the methodology used in *Xuncax* (as requested by Defendants) would compel the

---

[10] FAC ¶¶ 78 and 89 allege that as the result of the torture and physical and mental abuse of Ali, Shirin and L.A.S. suffered and continue to suffer psychological, mental and emotional pain, suffering, disability and distress, were and are deprived of Ali's society, consortium, comfort, care and solatium, and suffered serious pecuniary harm.

[11] *See e.g. Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56 (D.D.C. 2006) (awarding IIED damages under D.C. law to father and brother of young man injured in bombing).

conclusion that Shirin and L.A.S. have valid IIED claims under D.C. law even if (as claimed by defendants) they cannot bring claims under the ATS. *Id.*

        The court below dismissed Shafis' non-federal Negligence and IIED claims on the sole ground that dismissal of their federal (*i.e.,* ATS) claims rendered exercise of supplemental jurisdiction over their non-federal claims inappropriate. *See Shafi*, 686 F. Supp. 2d at 31 ("[I]n a typical case where all federal law claims have been dismissed, the factors will counsel against exercising supplemental jurisdiction.... The plaintiffs' third claim alleges a violation of Israeli law, and the plaintiffs have not pled a jurisdictional basis for that claim other than supplemental jurisdiction under § 1367.... Because the plaintiffs' first two claims will be dismissed, there are no remaining claims over which there exists original subject-matter jurisdiction") and *id.*, 686 F. Supp. 2d at n. 7 (dismissing the IIED claim under D.C. law because "the plaintiffs have not pled a jurisdictional basis for it other than supplemental jurisdiction under § 1367. Although considerations of comity and judicial economy may not weigh as heavily in favor of dismissal of a claim under District of Columbia law as they do for a claim under Israeli law, there are also no unusual circumstances counseling in favor of exercising supplemental jurisdiction either. Thus, any claim for intentional infliction of emotional distress also will be dismissed.").

        Thus, if this Court reverses the dismissal and directs the reinstatement of the Shafis' ATS claims, the sole ground for the decision of the court below to

-30-

decline supplemental jurisdiction will have *vanished*. Therefore, if this Court reverses the dismissal of the ATS claims (as the Shafis respectfully believe it should), the Court should also reverse dismissal of and reinstate the Shafis' non-federal claims.

### CONCLUSION

This appeal should be granted in all respects, and the order of the court below reversed to the extent asserted herein.

Dated:     New York, New York
           July 6, 2010

                              Respectfully submitted,

                              JAROSLAWICZ & JAROS, LLC.
                              *Attorneys for the Plaintiffs-Appellants*


                              by:   _____
                                    Robert J. Tolchin,
                                    Of Counsel

                              225 Broadway, 24th floor
                              New York, New York 10007
                              (212) 227-2780

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 6,989 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced

typeface using Word Perfect in Times New Roman, 14 point font.


JAROSLAWICZ & JAROS, LLC.
*Attorneys for the Plaintiffs-Appellants*

_____
By: Robert J. Tolchin
Of Counsel
225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

**Prepared by PrintingHouse Press, Ltd.**
**10 East 39th Street, New York, NY 10016**
**Tel No: (212) 719-0990 Fax No: (212) 398-9253**

STATE OF NEW YORK            )
COUNTY OF NEW YORK           )        SS

Dave Jackson, Being duly sworn, deposes and says that deponent is not party to the action, and is over 18 years of age.

That on 7/6/2010 deponent caused to be served 2 copy(s) of the within

<u>Appellants' Brief</u>

upon the attorneys at the address below, and by the following method:

**<u>By FedEx and ECF</u>**
Miller & Chevalier Chartered
Attorneys for Defendants-Appellees
655 15th Street, NW, Suite 900
Washington, D.C. 20005
202-626-5800

Sworn to me this Tuesday, June 6, 2010
ALLISON R. WADE
Notary Public, State of New York
No. 01WA6191434
Qualified in New York County Commission Expires 8/11/2012

Case Name:  Ali Mahmud Ali Shafi v. The Palestinian Authority
Case No. 10-7024